**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **ALAINA HATFIELD, on behalf of herself and all other persons similarly situated, known and unknown,** | ) | |
| *Plaintiff,* | ) | **Case No.** |
| *v.* | ) | |
| **GUARDIANVETS, INC., and JOHN DILLON, individually,** | ) | |
| *Defendants.* | ) | |

**CLASS AND COLLECTIVE ACTION COMPLAINT**

Plaintiff Alaina Hatfield ("Hatfield"), on behalf of herself and all others similarly situated, known and unknown, complains against Defendants GuardianVets, Inc. ("GuardianVets") and its CEO John Dillon ("Dillon"), individually, for their misclassification of their workers as independent contractors and their resulting failure to pay earned overtime wages in violation of the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.* ("FLSA") and the Illinois Minimum Wage Law, 820 ILCS 105/1, *et seq.* ("IMWL"). Hatfield further complains, on behalf of herself and all others similarly situated, known and unknown, against GuardianVets for unjust enrichment under Illinois common law arising from GuardianVets' misclassification of herself and those similarly situated as independent contractors. In support of her claims, Hatfield states:

**JURISDICTION AND VENUE**

1. This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1331 (federal question); 29 U.S.C. § 216(b) (FLSA), and 28 U.S.C. § 1367(a) (supplemental jurisdiction).

2. Venue is appropriate in this district pursuant to 28 U.S.C. § 1391(b)(1), (2) (venue generally) and 29 U.S.C. § 216(b) (FLSA).

3. Defendants regularly conduct business in this District.

## PARTIES

4. Plaintiff Alaina Hatfield is an individual and a resident of Bridgeport, Illinois. Hatfield provided labor to GuardianVets in exchange for wages.

5. Defendant GuardianVets, Inc. ("GuardianVets") is a for-profit corporation organized in the state of Delaware. GuardianVets' principal place of business is located at 1801 W. Belle Plaine Avenue, #205, Chicago, Cook County, Illinois.

6. According to the Illinois Secretary of State's website, GuardianVets' registered agent is Leslee M. Cohen, 420 N. Wabash Avenue, Suite 500, Chicago, Illinois 60611.

7. GuardianVets is a business that offers virtual veterinary triage services to animal hospitals and clinics.

8. Defendant John Dillon ("Dillon") is and has been GuardianVets' Chief Executive Officer at all times relevant to the claims alleged in this Complaint.

9. Upon information and belief, Dillon resides at 4507 N. Magnolia Street, Apt. 2S, Chicago, Illinois.

10. At all times relevant to this Complaint, Dillon was and is an officer and agent of GuardianVets. Dillon permitted and encouraged GuardianVets to classify Plaintiffs and all those similarly situated to them as independent contractors.

11. At all relevant times herein, Hatfield and the Classes that she seeks to represent, are current and former hourly workers GuardianVets who were classified as independent contractors.

## CLASS DEFINITIONS

12. Hatfield brings Counts I and II of this action on a collective and class basis on behalf of the following class of similarly situated individuals (the "Overtime Class"):

> All other persons who contracted to provide services for GuardianVets, and who personally provided services to GuardianVets, who have been classified as

> independent contractors, and who worked in excess of 40 hours in a single week over the previous three years and did not receive overtime wages as mandated by the FLSA and IMWL from three years prior to the filing of this lawsuit until the date of judgment.

13. Hatfield's executed collective opt-in form is attached as **Exhibit 1**.

14. Hatfield brings Count III of this action as a class on behalf of the following class of similarly-situated individuals (the "Unjust Enrichment Class"):

> All other persons who contracted to provide services for GuardianVets, and who personally provided services to GuardianVets, who have been classified as independent contractors from five years prior to the filing of this lawsuit until the date of judgment.

15. The "Overtime Class" and the "Unjust Enrichment Class" shall be referenced together as "the Classes."

## FACTS

<u>Defendants GuardianVets and Dillon</u>

16. Guardianvets is a business that provides teletriage services for veterinary providers and their clients to use.

17. Veterinary hospitals pay a fee to GuardianVets to provide overflow and after-hours call support to their clientele.

18. When needed, veterinary hospital clients will be connected to GuardianVets Customer Service Representatives and, if necessary, a member of GuardianVets Veterinary Technician team for assistance.

19. Dillon is GuardianVets' founder and CEO.

20. Among Dillon's duties as CEO, Dillon had the authority to create and implement policies and practices governing GuardianVets workers, including but not limited to GuardianVets' wage practices and policies.

21. At all times relevant to the Complaint, Dillon exercised his authority to create and implement policies and practices governing GuardianVets workers, including but not limited to GuardianVets' the wage practices and policies complained of herein.

22. As a condition of employment, GuardianVets caused Hatfield and members of the Classes to execute an Independent Contractor Consulting Agreement ("ICC Agreement").

23. The ICC Agreement contains numerous provisions providing that the "consultant" was an "independent contractor," and not an "employee." For example, the ICC Agreement states in part:

> **Independent Consultant.** Consultant's relationship with the Company will be that of an Independent Consultant and not that of an employee. Nothing herein (except as reflected in paragraph 8) is intended nor should be construed to limit Consultant from being an employee of another company nor to serve as an Independent contractor for other persons/entities.

24. GuardianVets and its agents drafted the ICC Agreement.

25. GuardianVets required its workers, including Hatfield and members of the Classes, to execute the ICC Agreement as a condition of working for GuardianVets.

26. Hatfield and members of the Classes did not have the opportunity to negotiate the terms of the ICC Agreement, including but not limited to their classification as an independent contractor.

27. GuardianVets and its agents drafted and implemented the ICC Agreement as a condition for Hatfield and members of the Classes to work for GuardianVets at the direction of Dillon.

Plaintiff Alaina Hatfield

28. Hatfield worked for GuardianVets from January 18, 2022, until September 23, 2022.

29. GuardianVets hired Hatfield after she completed two interviews with GuardianVets and offered her the job of Veterinary Technician.

30. A prerequisite for working as a Veterinary Technician at GuardianVets was being a licensed Veterinary Technician in the State of New York.

31. Hatfield was not a licensed Veterinary Technician in the State of New York at the time she applied to work for GuardianVets.

32. As part of her offer of employment, GuardianVets agreed to reimburse Hatfield costs associated with becoming licensed in the State of New York as long as she remained employed with GuardianVets for one year.

33. Hatfield became a licensed Veterinary Technician in the State of New York so that she may work for GuardianVets, and in reliance on GuardianVets' promise to reimburse her costs associated with becoming licensed in the State of New York.

34. Prior to Hatfield beginning her employment, GuardianVets told that her that the job was an independent contractor position, subject to an IRS-Form 1099, and that she would receive an agreement via email to sign electronically.

35. On or around January 17, 2022, GuardianVets emailed Hatfield a copy of the ICC Agreement.

36. Hatfield did not have the opportunity to negotiate any of the terms of the terms of the ICC Agreement.

37. On January 17, 2022, Hatfield electronically signed the ICC Agreement. A copy of the executed ICC Agreement is attached to this Complaint as **Exhibit 2**.

38. Hatfield began working for GuardianVets on January 18, 2022.

39. Hatfield was hired as a Veterinary Technician and worked solely in that role for the first three months of her tenure with GuardianVets.

40. Exhibit A of the ICC Agreement contains a job description for the role of Veterinary Technician. It states:

> **Description of Services:** GuardianVets Veterinary Technician
>
> **Duties and Job Requirements:**
>
> You will have primary responsibility for handling incoming triage consultations and escalating calls to our on-call Veterinarians, when necessary, on an as-needed basis with GuardianVets.
>
> You will also take a leadership position within the team, including but not limited to helping with the following activities:
>
> - Helping develop triage protocols
> - Helping assist with product feedback and identifying key improvement areas
> - Helping with business development efforts (as necessary)
> - Attending client calls (as necessary)
>
> Notwithstanding, the independent contractor work available now, until further written notice, will be on Fridays, Saturdays and Sundays. Further, solely to reduce overhead, paperwork, and to assist in providing at least a minimum level of service from Independent Contractor, at least eight (8) hours (of your choosing)

*See* **Exhibit 2**.

41. As a Veterinary Technician, Hatfield's primary duties revolved around logging onto taking calls from the veterinary hospitals that GuardianVets supports.

42. Specifically, Hatfield fielded calls from the clients of GuardianVets' hospital clients.

43. She would then determine whether the veterinary issue was one that she, as a Veterinary Technician, was permitted to provide a recommendation on.

44. She made this determination by strictly following a GuardianVets' written protocol that provided which ailments or injuries GuardianVets Veterinary Technicians may or may not provide a recommendation regarding.

45. Typically, GuardianVets Veterinary Technicians were permitted to only offer recommendations regarding minor ailments or injuries, such as providing recommendations as to administer first aid.

46. GuardianVets Veterinary Technicians were prohibited to provide recommendations regarding more severe ailments or injuries. For example, Hatfield was prohibited by GuardianVets' written protocol from advising hospital clients to induce the animal to vomit.

47. Hatfield then entered a summary of her conversation with the hospital's client, whether she was permitted to make a recommendation on the issue, and if she was, entered her recommendation into GuardianVets' software. This information would then be transmitted to the veterinary provider.

48. Hatfield would then triage the call. In cases where she was permitted to provide guidance, she would provide guidance to the hospitals' clients in accordance with GuardianVets' written protocol and the written guidance of the hospital and follow the protocols that each provider had provided. In more severe cases where Hatfield was not permitted to provide guidance, she would refer the hospitals' clients to nearby veterinary centers.

49. In or around May 2022, Hatfield was promoted to the role of Senior Veterinary Technician. Despite the promotion, Hatfield's rate of pay did not change.

50. As a Senior Veterinary Technician, Hatfield's responsibilities included the same as those of a Veterinary Technician. Additionally, Hatfield was expected to review other GuardianVets' workers' calls with hospitals' clients.

51. In or around June 2022, Hatfield was promoted to Team Lead.

52. Hatfield received a pay raise when she was promoted to Team Lead. However, she only received that rate of pay when she performed Team Lead duties.

53. Despite being promoted to the role of Team Lead, Hatfield continued to perform the duties of a Veterinary Technician and a Senior Veterinary Technician. Indeed, Hatfield continued to spend the majority of her working time performing the duties of a Veterinary Technician.

54. When Hatfield performed the duties of a Veterinary Technician and a Senior Veterinary Technician after her promotion to Team Lead, she received her previous rate of pay.

55. Indeed, there were instances when Hatfield performed the duties associated with those of a Team Lead but was only paid Veterinary Technician and a Senior Veterinary Technician wages.

56. As a Team Lead, Hatfield was expected and required to take a minimum number of triage calls per hour, answered her colleagues' questions, perform performance reviews, monitor the disciplinary log for GuardianVets' Veterinary Technicians and Senior Veterinary Technicians.

57. Regarding the disciplinary log, GuardianVets' clients would populate the disciplinary log if they had complaints regarding the service that GuardianVets workers provided. Examples of customer complaints included Veterinary Technicians being late to or missing meetings with customers, and not taking calls.

58. As a Team Lead, Hatfield was also expected to, and did, receive calls from veterinary hospital managers if there was a complaint regarding GuardianVets' service.

59. Hatfield resigned from GuardianVets on September 23, 2022.

60. Throughout her tenure with GuardianVets, Hatfield regularly and consistently worked over 40 hours per week.

61. For example, between February 2022 through July 2022, Hatfield worked, on average, between 45 and 50 hours per week.

62. Hatfield never received overtime pay as mandated by the FLSA and IMWL for any hours that she worked in excess of 40 in a given week. Instead, Hatfield received her normal wage.

63. Under the FLSA and its interpreting regulations, an "employee" is "an individual whom an employer suffers, permits, or otherwise employs to work. 29 U.S.C. 203(e)(1), (g)." 29 C.F.R. § 795.105.

64. "'Employer' is defined to 'include[ ] any person acting directly or indirectly in the interest of an employer in relation to an employee.'" 29 U.S.C. 203(d)." *Id.*

65. "The [FLSA]'s definitions are meant to encompass as employees all workers who, as a matter of economic reality, are economically dependent on an employer for work. A worker is an independent contractor, as distinguished from an 'employee' under the Act, if the worker is, as a matter of economic reality, in business for themself." *Id.*

66. Regulations interpreting the FLSA provide guidance regarding whether a worker is "economically dependent" on an employer.

67. Specifically, 29 C.F.R. § 795.110 provides a six-factor test that provide "tools or guides to conduct a totality-of-the-circumstances analysis." 29 C.F.R. § 795.110(a)(1).

68. The six-factors, identified as the "economic reality factors," are:

(1) Opportunity for profit or loss depending on managerial skill.

(2) Investments by the worker and the potential employer.

(3) Degree of permanence of the work relationship.

(4) Nature and degree of control.

(5) Extent to which the work performed is an integral part of the potential employer's business.

(6) Skill and initiative.

29 C.F.R. § 795.110(b)(1)-(6).

69. The circumstances surrounding Hatfield's tenure with GuardianVets strongly indicate that Hatfield was GuardianVets' employee, and GuardianVets was her employer, under the FLSA.

70. As to the first factor regarding "opportunity for profit or loss depending on managerial skill", the regulation states in part:

> The following facts, among others, can be relevant: whether the worker determines or can meaningfully negotiate the charge or pay for the work provided; whether the worker accepts or declines jobs or chooses the order and/or time in which the jobs

> are performed; whether the worker engages in marketing, advertising, or other efforts to expand their business or secure more work; and whether the worker makes decisions to hire others, purchase materials and equipment, and/or rent space.

29 C.F.R. § 795.110(b)(1).

71. Hatfield had no meaningful opportunity to negotiate her pay. Her wage was offered on a take it or leave it basis.

72. Nor did she have the opportunity to accept or decline work. For example, GuardianVets implemented an attendance policy that provided that Hatfield and other "independent contractors" were only permitted three absences per year, unless GuardianVets considered the absences "excused." Furthermore, Hatfield was subject to GuardianVets' requirement of fielding a minimum number of calls per hours.

73. Hatfield did not engage in efforts to obtain more work with GuardianVets. Hatfield's work was strictly defined by GuardianVets' expectations as provided by its written protocols and directives from its supervisors and management.

74. Hatfield had no authority to hire others to perform her work with GuardianVets.

75. While Hatfield was required to use her own laptop, GuardianVets did reimburse her for her headset, and promised to reimburse the cost associated with becoming licensed in the State of New York.

76. As to the second factor regarding "investments by the worker and the potential employer," the regulation states in part:

> This factor considers whether any investments by a worker are capital or entrepreneurial in nature. Costs to a worker of tools and equipment to perform a specific job, costs of workers' labor, and costs that the potential employer imposes unilaterally on the worker, for example, are not evidence of capital or entrepreneurial investment and indicate employee status. Investments that are capital or entrepreneurial in nature and thus indicate independent contractor status generally support an independent business and serve a business-like function, such as increasing the worker's ability to do different types of or more work, reducing costs, or extending market reach…. [T]he focus should be on comparing the investments to determine whether the worker is making similar types of investments as the potential employer

> (even if on a smaller scale) to suggest that the worker is operating independently, which would indicate independent contractor status.

29 C.F.R. § 795.110(b)(2).

77. As noted above, while Hatfield used her own computer to perform work for GuardianVets, GuardianVets reimbursed her for the cost of a headset and offered to reimburse her the costs associated with becoming licensed in the State of New York.

78. More fundamentally, to the extent Hatfield used her own computer to perform GuardianVets work, she did not use her computer to support an "independent business and serve a business-like function, such as increasing the worker's ability to do different types of or more work, reducing costs, or extending market reach." *Id.* Instead, Hatfield used her computer to perform GuardianVets work, under the direction and control of GuardianVets' directives and protocols, and subject to GuardianVets' supervision.

79. As to the third factor regarding the "degree of permanence of the work relationship," the regulation states in part:

> This factor weighs in favor of the worker being an employee when the work relationship is indefinite in duration, continuous, or exclusive of work for other employers. This factor weighs in favor of the worker being an independent contractor when the work relationship is definite in duration, non-exclusive, project-based, or sporadic based on the worker being in business for themself and marketing their services or labor to multiple entities. This may include regularly occurring fixed periods of work, although the seasonal or temporary nature of work by itself would not necessarily indicate independent contractor classification. Where a lack of permanence is due to operational characteristics that are unique or intrinsic to particular businesses or industries and the workers they employ, this factor is not necessarily indicative of independent contractor status unless the worker is exercising their own independent business initiative.

29 C.F.R. § 795.110(b)(3).

80. Hatfield's tenure with GuardianVets was indefinite in duration and continuous. She was "hired" on January 17, 2022, and "resigned" on September 22, 2022. Her work was not "project-

based" or sporadic; indeed, she was expected to complete tasks that were integral to GuardianVets' business, and was subject to attendance requirements.

81. As to the fourth factor regarding the "nature and degree of control" of the relationship the regulation states in part:

> This factor considers the potential employer's control, including reserved control, over the performance of the work and the economic aspects of the working relationship. Facts relevant to the potential employer's control over the worker include whether the potential employer sets the worker's schedule, supervises the performance of the work, or explicitly limits the worker's ability to work for others. Additionally, facts relevant to the potential employer's control over the worker include whether the potential employer uses technological means to supervise the performance of the work (such as by means of a device or electronically), reserves the right to supervise or discipline workers, or places demands or restrictions on workers that do not allow them to work for others or work when they choose. Whether the potential employer controls economic aspects of the working relationship should also be considered, including control over prices or rates for services and the marketing of the services or products provided by the worker. Actions taken by the potential employer for the sole purpose of complying with a specific, applicable Federal, State, Tribal, or local law or regulation are not indicative of control. Actions taken by the potential employer that go beyond compliance with a specific, applicable Federal, State, Tribal, or local law or regulation and instead serve the potential employer's own compliance methods, safety, quality control, or contractual or customer service standards may be indicative of control. More indicia of control by the potential employer favors employee status; more indicia of control by the worker favors independent contractor status.

29 C.F.R. § 795.110(b)(4).

82. GuardianVets' exercised substantial control over Hatfield's work. Hatfield was required to follow GuardianVets' job-related protocols. If she failed to follow the protocols, she was subject to discipline and discharge.

83. GuardianVets required Hatfield to field a minimum number of calls per hour.

84. GuardianVets' personnel performed call reviews on Hatfield to ensure she was following the company's protocols.

85. Although GuardianVets permitted Hatfield to pick her shifts at the outset of her tenure, once she had chosen her shifts, she was required to work during those shifts unless she found another GuardianVets worker to work that shift for her on a permanent basis.

86. If Hatfield's shift conflicted with a family obligation, such as a medical emergency or funeral, Hatfield was required to find another GuardianVets worker to fill in for her. Additionally, Hatfield was required to provide documentation, such as a doctor's note or obituary, to GuardianVets substantiating the reason for her absence.

87. GuardianVets trained Hatfield on its protocols. Additionally, GuardianVets provided retraining to Hatfield in certain instances.

88. Hatfield was subject to GuardianVets' rule that provided that a worker would be discharged if she were to miss work three times in a year for reasons that GuardianVets considered unexcused.

89. Hatfield was subject to discipline if she arrived to her shift late or left her shift early.

90. GuardianVets maintained a disciplinary log to monitor Hatfield's performance during calls with clients. Specifically, Team Leads listened to recorded conversations between GuardianVets' Veterinary Technicians and hospital clients and identified areas where the Veterinary Technician did not meet expectations as set forth in GuardianVets' written protocols.

91. Hatfield participated in this process as a Veterinary Technician, Senior Veterinary Technician, and a Team Lead.

92. As to the fifth factor regarding the "extent to which the work performed is an integral part of the potential employer's business," the regulation states in part:

> This factor considers whether the work performed is an integral part of the potential employer's business. This factor does not depend on whether any individual worker in particular is an integral part of the business, but rather whether the function they perform is an integral part of the business. This factor weighs in favor of the worker being an employee when the work they perform is critical, necessary, or central to the potential employer's principal business. This factor weighs in favor of the worker being an independent contractor when the work they perform is not critical, necessary, or central to the potential employer's principal business.

29 C.F.R. § 795.110(b)(5).

93. Hatfield's work was integral to GuardianVets' business. GuardianVets' website states in part, "[w]e provide an all-hours extension of your veterinary team, so you can provide the best care without worrying about burning out."[1]

94. The work described on GuardianVets' website is exactly the type of work that Hatfield supported.

95. As to the sixth factor regarding "skill and initiative," the regulation states in part:

> This factor considers whether the worker uses specialized skills to perform the work and whether those skills contribute to business-like initiative. This factor indicates employee status where the worker does not use specialized skills in performing the work or where the worker is dependent on training from the potential employer to perform the work. Where the worker brings specialized skills to the work relationship, this fact is not itself indicative of independent contractor status because both employees and independent contractors may be skilled workers. It is the worker's use of those specialized skills in connection with business-like initiative that indicates that the worker is an independent contractor.

29 C.F.R. § 795.110(b)(6).

96. As noted above, Hatfield's work for GuardianVets required her to be trained on GuardianVets protocols, and in some instances retrained, so that she may perform her work for GuardianVets to its expectations.

97. In light of the above facts and factors, Hatfield was an employee of GuardianVets under the FLSA.

98. Furthermore, based on the facts supporting Hatfield's status as an employee under the FLSA, Hatfield also satisfied the requirement of being an "employee" under IRS statutes and regulations.

99. Throughout her tenure with GuardianVets, Hatfield did not qualify for any exemptions under the FLSA.

---

[1] https://guardianvets.com/about/ (last visited January 17, 2025, at 1:35 p.m.).

100. At no time during her employment with GuardianVets did Hatfield qualify for the "bona fide executive" exemption under the FLSA. 29 U.S.C. § 213(a)(1), 5 C.F.R. § 551.205.

101. For the "bona fide executive" exemption to apply, the employee's "primary duty" must be "management (as defined in § 551.104)," and she must have "the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion, or any other change of status of other employees, are given particular weight." 5 C.F.R. § 551.205(a), (a)(2).

102. At no time during her employment was Hatfield's primary duty "management," as defined under 5 C.F.R. § 551.104. The regulation provides in relevant part:

> Management means performing activities such as interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or financial records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment, or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

103. Hatfield performed none of these functions during her employment with GuardianVets.

104. Furthermore, at no time during her employment with GuardianVets did Hatfield have the authority to hire or fire other employees. Hatfield never made suggestions or recommendations regarding the hiring, firing, promotion, advancement, or any other change of status of other GuardianVets employees.

105. At no time during her employment with GuardianVets did Hatfield qualify for the "administrative" exemption under the FLSA. 29 U.S.C. § 213(a)(1), 5 C.F.R. § 551.206.

106. For the administrative exemption under the FLSA to apply, the employee's

> primary duty is the performance of office or non-manual work directly related to the management or general business operations, as distinguished from production functions, of the employer or the employer's customers and whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

5 C.F.R. § 551.206.

107. Hatfield never had the authority, and never was expected to influence or bind GuardianVets, with respect to any "matters of significance." *Id.*

108. Nor was Hatfield ever permitted to use sufficient discretion or independent judgment as to matters of significance for GuardianVets. For example, Hatfield:

- Never had the authority to formulate, affect, interpret, or implement management policies or operating practices;
- Never carried out major assignments in conducting GuardianVets' operations;
- Never performed work that affected GuardianVets' operations to a substantial degree;
- Never had the authority to commit GuardianVets in matters of significant financial impact;
- Never had the authority to waive or deviate from GuardianVets' established policies and procedures without prior approval;
- Never had the authority to negotiate and bind GuardianVets on significant matters;
- Never provided consultation or expert advice to GuardianVets management;
- Was never involved in planning long- or short-term organizational objectives;
- Never investigated or resolved matters of significance on behalf of management; and
- Never represented the organization in handling complaints, arbitrating disputes, or resolving grievances.

*See* 5 C.F.R. § 551.206(b).

109. At no time during her employment with GuardianVets did Hatfield qualify for the "learned professional" exemption under the FLSA. 29 U.S.C. § 213(a)(1), 29 C.F.R. § 541.301.

110. For the "learned professional" exemption to apply,

> an employee's primary duty must be the performance of work requiring advanced knowledge in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction. This primary duty test includes three elements:
>
> (1) The employee must perform work requiring advanced knowledge;
>
> (2) The advanced knowledge must be in a field of science or learning; and
>
> (3) The advanced knowledge must be customarily acquired by a prolonged course of specialized intellectual instruction.

29 C.F.R. § 541.301(a).

111. None of Hatfield's duties required "advanced knowledge … customarily acquired by a prolonged course of specialized intellectual instruction." 29 C.F.R. § 541.301(a)(3).

112. The FLSA regulation provides in relevant part,

> The phrase "customarily acquired by a prolonged course of specialized intellectual instruction" restricts the exemption to professions where specialized academic training is a standard prerequisite for entrance into the profession. The best prima facie evidence that an employee meets this requirement is possession of the appropriate academic degree.

29 C.F.R. § 541.301(d).

113. Hatfield was a licensed veterinary technician. None of Hatfield's primary duties required "possession of the appropriate academic degree."

114. The FLSA regulation further provides that, "[l]icensed practical nurses and other similar health care employees … generally do not qualify as exempt learned professionals because possession of a specialized advanced academic degree is not a standard prerequisite for entry into such occupations." 29 C.F.R. § 541.301(e)(2).

115. Hatfield's primary duties throughout her employment with GuardianVets were most akin to those of a "practical nurse," as described by 29 C.F.R. § 541.301(e)(2).

116. GuardianVets' misclassification of Hatfield and members of the Classes resulted in a windfall for GuardianVets.

117. In addition to avoiding paying overtime wages, GuardianVets' misclassification of members of the Unjust Enrichment Class allowed it to avoid paying state and federal employment taxes and benefits (including but not limited to social security taxes, unemployment insurance, income tax, and workers' compensation insurance), and administrative costs.

118. Hatfield was damaged as a result of GuardianVets' misclassification.

119. For example, Hatfield paid more in federal and state taxes under the IRS Form 1099 as she would have if she were properly classified as an IRS Form W-2 employee.

120. Further, Hatfield did not receive social security benefits as a result of working for GuardianVets.

121. Had Hatfield and members of the Classes been properly classified as IRS Form W-2 employees, they would have benefitted from GuardianVets' mandated social security contributions.

122. Hatfield reported all of her earnings from GuardianVets under an IRS Form 1099.

**COLLECTIVE AND CLASS ALLEGATIONS**

123. Hatfield seeks to maintain this suit as a Collective pursuant to 29 U.S.C. §216(b) and as a Class pursuant to Fed. R. Civ. Pro. 23.

124. Hatfield brings Counts I and II of this action on a collective and class basis on behalf of the following class of similarly-situated individuals (the "Overtime Class"):

> All other persons who contracted to provide services for GuardianVets, and who personally provided services to GuardianVets, who have been classified as independent contractors, and who worked in excess of 40 hours in a single week over the previous three years and did not receive overtime wages as mandated by the FLSA and IMWL from three years prior to the filing of this lawsuit until the date of judgment.

125. Hatfield's executed collective opt-in form is attached as **Exhibit 1**.

126. GuardianVets employed approximately 100 independent contractors who performed the roles of Veterinary Technician, Senior Veterinary Technician, and Team Lead.

127. Approximately 25 of those individuals performed over 40 hours of work in a pay

period during Hatfield's employment with GuardianVets.

128. None of those individuals were paid overtime wages as mandated by the FLSA and IMWL.

129. GuardianVets suffered from high turnover during Hatfield's employment with GuardianVets.

130. Based on GuardianVets' policy of misclassifying its employees as independent workers, and the high turnover during Hatfield's tenure with GuardianVets, Hatfield reasonably estimates that the number of members in the Overtime Class equals or exceeds 40 individuals.

131. Hatfield brings Count III of this action as a class on behalf of the following class of similarly-situated individuals (the "Unjust Enrichment Class"):

> All other persons who contracted to provide services for GuardianVets, and who personally provided services to GuardianVets, who have been classified as independent contractors from five years prior to the filing of this lawsuit until the date of judgment.

132. GuardianVets employed approximately 100 independent contractors who performed the roles of Veterinary Technician, Senior Veterinary Technician, and Team Lead.

133. Most or all those individuals have been damaged as a result of GuardianVets' unjust enrichment as a result of their misclassification of these workers as independent contractors.

134. Based on GuardianVets' policy of misclassifying its employees as independent workers, GuardianVets' reaping the benefits from its misclassification, and its employees being damaged as a result; and the high turnover among workers misclassified as independent contractors, Hatfield reasonably estimates that the number of members in the Unjust Enrichment Class equals or exceeds 40 individuals

135. The members of the Classes are so numerous that joinder of all members is impracticable.

136. Common issues of law and fact predominate the claims of the Classes. Specifically,

all claims subject to the Overtime Class are predicated on a finding that GuardianVets misclassified its workers as independent contractors when they were in fact employees, and as a result, did not pay overtime wages as mandated under the FLSA and IMWL to workers who worked over 40 hours in a given pay period.

137. Further, all claims subject to the Unjust Enrichment Class are predicated on a finding that GuardianVets misclassified its workers as independent contractors when they were in fact employees, and as a result, GuardianVets benefitted from its decision to misclassify these workers at the workers' expense.

138. Hatfield is an adequate representative of the Classes because all potential plaintiffs were subject to GuardianVets' uniform practices and policies that resulted in (1) their overtime damages, and (2) their damages resulting from GuardianVets' unjust enrichment. Further, Hatfield and the potential members of the Classes have suffered the same type of economic damages as a result of GuardianVets' practices and policies.

139. Hatfield will fairly and adequately represent and protect the interests of the Classes. Plaintiffs' counsel is competent and experienced in litigating large wage and hour class and collective actions.

140. Finally, a class action is the only realistic method available for the fair and efficient adjudication of this controversy. The expense and burden of individual litigation makes it impractical for members of the Classes to seek redress individually for the wrongful conduct alleged herein. Were each individual member required to bring a separate lawsuit, the resulting multiplicity of proceedings would cause undue hardship and expense for the litigants and the Court and create the risk of inconsistent rulings which would be contrary to the interest of justice and equity.

**COUNT I: FLSA EARNED AND UNPAID OVERTIME AGAINST DEFENDANTS – COLLECTIVE AND CLASS ACTION**

141. The foregoing Paragraphs are incorporated by reference herein.

142. This Count arises from Defendants' violation of the FLSA through its policy/practice of misclassifying its workers as independent workers, resulting in their failure to pay Hatfield and members of the Overtime Collective and Class overtime wages for all hours worked in excess of 40 per workweek.

143. Pursuant to 29 U.S.C. § 216(b), this action may be maintained by a plaintiff who has been damaged by a defendant's failure to comply with 29 U.S.C. §§ 206 – 207. Hatfield has attached as **Exhibit 1** her Notice of Consent to Become a Party Plaintiff in a Collective Action under the Fair Labor Standards Act.

144. All past and present employees of Defendants who have worked for Defendants as independent contractors in the previous three years are similarly situated to Hatfield because they were not paid wages at the rate of one-and-one-half of their regular hourly wage for any work more than 40 hours in a week.

145. None of Hatfield's job duties in any of her roles at GuardianVets qualified for an exemption under the FLSA.

146. None of the job duties for any members of the Overtime Class qualified for an exemption under the FLSA.

147. Hatfield was entitled to be compensated for all work performed, including overtime wages under the FLSA all hours worked above 40 hours in a week.

148. Defendants applied their compensation policies, which violate the FLSA, on a company-wide basis, including towards Hatfield and the Overtime Class and Collective.

149. Hatfield and the Overtime Class and Collective are or were engaged in job duties and responsibilities integral and indispensable to the operation of Defendants' business, and neither Hatfield nor any other member of the Overtime Class and Collective has received overtime compensation for any hours worked over 40 in one workweek.

150. Defendants' failure to pay compensation for all time worked and, as a result, its failure to pay compensation at the overtime rate for all hours worked over 40 per workweek, is a willful violation of the FLSA. Defendants' conduct shows that it knew that its conduct violated the FLSA, or showed reckless disregard for whether its actions complied with the FLSA.

151. Hatfield's experiences are typical of the experiences of the Overtime Class and Collective.

152. For all members of the Collective to become fully aware of their right to join this cause of action, a certain period of time, as determined by this Court, is necessary to send notice to the entire Collective, as well as certain additional time for those members to file consent forms with this Court as provided by 29 U.S.C. § 216(b).

153. The members of the Overtime Class and Collective who are still employed by Defendants may be reluctant to raise individual claims for fear of retaliation.

**COUNT II: IMWL FLSA EARNED AND UNPAID OVERTIME AGAINST DEFENDANTS – CLASS ACTION**

154. The foregoing Paragraphs are incorporated by reference herein.

155. This Count arises from Defendants' violation of the IMWL through its policy/practice of misclassifying its workers as independent workers, resulting in their failure to pay Hatfield and members of the Overtime Class overtime wages for all hours worked in excess of 40 per workweek.

156. All past and present employees of Defendants who have worked for Defendants as independent contractors in the previous three years are similarly situated to Hatfield because they were not paid wages at the rate of one-and-one-half of their regular hourly wage for any work more than 40 hours in a week.

157. None of Hatfield's job duties in any of her roles at GuardianVets qualified for an exemption under the IMWL.

158. None of the job duties for any members of the Overtime Class qualified for an exemption under the IMWL.

159. Hatfield was entitled to be compensated for all work performed, including overtime wages under the IMWL all hours worked above 40 hours in a week.

160. Defendants applied their compensation policies, which violate the IMWL, on a company-wide basis, including towards Hatfield and the Overtime Class.

161. Furthermore, Defendants either knew, or would have known had it made an adequate inquiry into its policies and practices, that its misclassification of its workers as independent contractors and resulting avoidance of paying them overtime wages. Accordingly, their violation of the FLSA was willful.

162. Hatfield and the Overtime Class are or were engaged in job duties and responsibilities integral and indispensable to the operation of Defendants' business, and neither Hatfield nor any other member of the Overtime Class has received overtime compensation for any hours worked over 40 in one workweek.

163. Hatfield's experiences are typical of the experiences of the Overtime Class.

164. The members of the Overtime Class who are still employed by Defendants may be reluctant to raise individual claims for fear of retaliation.

## COUNT III: UNJUST ENRICHMENT UNDER ILLINOIS COMMON LAW AGAINST GUARDIANVETS – CLASS ACTION

165. The foregoing Paragraphs are incorporated by reference herein.

166. As a result of GuardianVets' mischaracterizing of Hatfield and the members of the Unjust Enrichment Class as "independent contractors," Hatfield and the members of the Unjust Enrichment Class were forced to forego incur additional tax liabilities, and forego benefits that inure from an employer-employee relationship.

167. Further, by mischaracterizing Plaintiff and the proposed class as "independent

contractors" GuardianVets evades employment-related obligations. GuardianVets illegally shifts these costs to Hatfield and the members of the Unjust Enrichment Class.

168. Plaintiffs' unjust enrichment claims fall outside of the scope of the ICC Agreements which Plaintiffs were required to sign, since these agreements characterized Plaintiffs as "independent contractors" while the reality of the relationship between GuardianVets and Hatfield and the members of the Unjust Enrichment Class was that of employer-employee.

169. By wrongly characterizing Hatfield and the members of the Unjust Enrichment Class as independent contractors, GuardianVets is able save significant sums of money that they otherwise should be forced to expend on state and federal employment taxes and benefits, including but not limited to social security taxes, unemployment insurance, income tax, and workers' compensation insurance; and administrative costs.

170. By misclassifying its employees as independent contractors, GuardianVets has been unjustly enriched.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Alaina Hatfield, on behalf of herself and all other similarly situated persons, known and unknown, respectfully requests that this Court enter an order as follows:

A. Determining that this action may be maintained as a class action under Fed. R. Civ. P. 23(b)(3);

B. Determining that this action may be maintained as a collective action pursuant to the FLSA;

C. Appointing Alaina Hatfield as Class Representative and her Counsel as Class and Collective Counsel;

D. Awarding Plaintiff and the Overtime Class' their earned and unpaid wages, to wit, unpaid overtime wages pursuant to the FLSA and IMWL;

E. Liquidated damages as provided by the FLSA, 29 U.S.C. § 260;

F. Statutory damages equivalent to the maximum statutory monthly interest penalties available pursuant to the IMWL, 820 ILCS 115/14;

G. Statutory damages equivalent to treble damages pursuant to the IMWL, 820 ILCS 115/14;

H. Awarding Plaintiff and the Unjust Enrichment Class compensatory damages;

I. Awarding reasonable attorneys' fees and costs incurred in pursuing this action; and

J. Ordering such other and further relief as the Court deems appropriate and just.

Date: January 17, 2025

Respectfully submitted,

ALAINA HATFIELD

*/s/ Alexandros Stamatoglou*
One of Plaintiffs' Attorneys

Garfinkel Group, LLC
701 N. Milwaukee Avenue, The CIVITAS
Chicago, IL 60642
Alexandros Stamatoglou (IARDC No. 6308169)
alex@garfinkelgroup.com
t: (312) 736-7991
f: (312) 549-9623